## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| **DEVINCCI HOURANI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 15-cv-933 (RMC)** |
| | ) | |
| **PSYBERSOLUTIONS LLC, _et al._,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## OPINION

This case shows how small the world has become.  Plaintiff Devincci Hourani is a businessman from the Republic of Kazakhstan who now lives in Virginia.  He sues PsyberSolutions LLC and others for alleged defamation arising from demonstrations outside his brother's residence in London and elsewhere in that city.  Video of at least one demonstration was posted on the Internet, on a website hosted by Defendants' server.  Mr. Hourani complains that Defendants set up defamatory websites and paid actors to conduct the demonstrations, which called him a murderer.  The Court will grant Defendants' motion to dismiss, dismissing Alistair Thomson and Bryan McCarthy for lack of personal jurisdiction and dismissing all claims against the remaining defendants, PsyberSolutions and its chief executive officer, Allison Blair, for failure to state a claim.  Mr. Hourani has not alleged actual malice, as required for a defamation claim asserted by a limited-purpose public figure under Virginia law.

# I. FACTS

Until 2007, Devincci Hourani was a successful businessman who owned and operated oil, broadcasting, and publishing companies in the Republic of Kazakhstan.  *See* Mot. to Dismiss [Dkt. 15], Ex. E (*Hourani v. Mirtchev* First Am. Compl.) ¶ 11.[1]  Indeed, as Kazakhstan privatized its industries, the Hourani family came to own "literally billions of dollars' worth of important businesses in Kazakhstan."  *See* Ex. B (Aliyev Decl.) ¶ 16; *see also* Ex. D (Devincci Hourani Decl.) ¶ 4 (the Hourani family has had business interests in Kazakhstan since shortly after Kazakhstan declared its independence from the Soviet Union in 1991).  Among other businesses, Plaintiff is the 92% owner of Caratube International Oil Company LLP, which has been engaged in a billion dollar arbitration against Kazakhstan over the termination of a concession for the exploration to explore and drill for oil.  *See* Devincci Hourani Decl. ¶ 7; Aliyev Decl. ¶ 15; Ex. F (Arbitration Decision); Ex. H (Liz Hoffman, *Kazakhstan Beats $1.2B Claims Over Axed Oil Contract*, Law360, June 15, 2012).

---

[1] Attached to the Motion to Dismiss are Exhibits A through K.  Exhibits A through E are documents filed in *Hourani v. Mirtchev*, Civ. No. 10-1618(TFH) (D.D.C.), a case where Devincci Hourani and his brother Issam alleged that Alexander Mirtchev and his company conspired to defame them by causing the Kazak Embassy to publish defamatory statements.  *See* Ex. A (*Hourani v. Mirtchev* Docket Sheet); Ex. B (Aliyev Decl.); Ex. C (Issam Hourani Decl.); Ex. D (Devincci Hourani Decl.); Ex. E. (*Hourani v. Mirtchev* First Am. Compl.)  The district court dismissed the complaint for failure to state a claim because there were insufficient allegations describing how the defendants caused the Embassy to publish the offensive statements.  *Hourani v. Mirtchev*, Civ. No. 10-1618(TFH) (Opinion 5/8/2013).  Exhibit F is an Arbitration Decision dated Dec. 4, 2014, filed in *Caratube Int'l Oil Co. & Devincci Hourani v. Republic of Kazakhstan*, Case No. ARB/13/13 (Int'l Centre for Settlement of Investment Disputes).  The Court takes judicial notice of the facts stated in Exhibits A through F as these documents are part of the public record from other proceedings.  *See Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007) (on a motion to dismiss, a court can take judicial notice of facts filed on the public record); *see also Covad Commc'ns Co. v. Bell Atlantic Co.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005) (same).  Exhibits G through K are news articles published between 2011 and 2015.  The Court takes judicial notice of the articles not for their truth but merely for the fact that they were published.

Plaintiff was connected with the President of Kazakhstan, Nursultan Nazarbayev.[2]

Plaintiff's brother, Issam Hourani, was at relevant times married to the sister of Rakhat Aliyev, President Nazarbayev's son-in-law. Aliyev Decl. ¶¶ 4, 14. Specifically, Mr. Aliyev was married to the President's daughter, Dariga Nazarbayeva, from 1983 to 2007. *Id*. ¶¶ 4, 17, 36. Plaintiff and the Hourani family "were always perceived within Kazakhstan as being among Mr. Aliyev's strongest supporters morally, materially, and financially." Ex. C (Issam Hourani Decl.) ¶ 4. During the ten year period from 1997 to 2007, Mr. Aliyev held high-level positions within the Kazakh government, including Chief of the Tax Police, First Deputy Minister for state tax revenues, First Deputy Head of the National Security Committee, Kazak Ambassador to Austria (twice), Kazakh Representative to the Organization for Security and Cooperation in Europe, and Deputy Foreign Affairs Minister. Aliyev Decl. ¶ 5. In 2007, Mr. Aliyev challenged his father-in-law's ability to remain President for life, and Mr. Aliyev publicly declared his own desire to run for President of Kazakhstan in the 2012 election. *Id*. ¶¶ 6, 16, 27. In response, President Nazarbayev allegedly proceeded to eliminate Mr. Aliyev from politics and from his family, stripping him of his ambassadorship, investigating him for various crimes, and demanding that a court enter Mr. Aliyev's divorce from Dariga Nazarbayeva. *Id*. ¶¶ 33-36.

Also in 2007, the government of Kazakhstan and Dariga Nazarbayeva took Plaintiff's companies from him through a series of actions. Opp'n [Dkt. 17] at 15; *see also* Devincci Hourani Decl. ¶ 9 (asserting that on June 9, 2007, Dariga Nazarbayeva threatened Plaintiff causing him to sign legal papers turning over millions of dollars of media interests to the

---

[2] Mr. Nazarbayev has been President of Kazakhstan since 1990.

First Presidential Fund);[3] Aliyev Decl. ¶¶ 45-47 (stating that over $2 billion was expropriated from the Hourani family by the government of Kazakhstan). Plaintiff asserts that the "decision to strip me of my assets in . . . various businesses stem[med] directly from my family's association with the President's former son-in-law Rakhat Aliyev." Devincci Hourani Decl. ¶ 5.

Plaintiff sues PsyberSolutions LLC, its Chief Executive Officer Allison Blair, Alistair Thomson, and Bryan McCarthy alleging that they operated a "Campaign" to assassinate Plaintiff's character, portraying Plaintiff as a "criminal" involved in the abduction, false imprisonment, torture, drugging, rape, and murder of Anastasya Novikova, the reputed mistress of Mr. Aliyev, in Beirut, Lebanon in 2004. Compl. [Dkt. 1] ¶¶ 9, 29-31, 53. Ms. Novikova died when she fell, jumped, or was thrown out of a window at an upper-floor Beirut apartment owned by Plaintiff and his brother, Issam.

Mr. Aliyev and the Hourani brothers were implicated publicly in the death of Ms. Novikova. On June 9, 2007, Interpol issued a notice regarding Ms. Novikova's murder, and noting that it occurred at the Hourani brothers' apartment in Beirut. Issam Hourani Decl. ¶ 23. On December 18, 2008, the U.S. Embassy in Kazakhstan stated on its website that the Hourani brothers owned the apartment where "the alleged mistress of Rakhat Aliyev was falsely imprisoned, drugged, and eventually murdered." *Hourani v. Mirtchev* First Am. Compl. ¶ 58. Further, Lebanese authorities put Plaintiff's name on a list of "persons warranting investigation for murder." Arbitration Decision ¶ 29. In 2012, Ms. Novikova's mother, in conjunction with the government of Kazakhstan, filed a joint criminal complaint as a *partie civile* in court in Lebanon against Plaintiff, his brother, and Mr. Aliyev related to the imprisonment and death of

---

[3] The record does not define or describe the "First Presidential Fund," but Plaintiff clearly asserts that the government of Kazakhstan took his assets.

Ms. Novikova.  *See* Arbitration Decision at ¶¶ 30-31, 38-40, 70, 74, 131-138.  Mr. Aliyev died in

February 2015,[4] and on July 13, 2015, the investigation judge in Lebanon, Rami Abdallah,

dismissed the murder charges against Mr. Aliyev due to his death.  *See* Decision of Investigation

Judge Abdullah at 11.  He also dismissed the murder charges against Plaintiff and his brother for

lack of evidence.  *Id*.  The Kazakhstan government and Ms. Novikova's family appealed "on the

ground that the investigative judge did not consider other crimes that were included in the

criminal complaint."  Reply [Dkt. 18] at 12 n.7 (citing Ex. A to Reply (Appeal of Decision by

Investigation Judge Abdullah)).  In recent years, Plaintiff has been the subject of multiple news

articles describing his relationship with Mr. Aliyev and his ongoing disputes with the

government of Kazakhstan.  Ex. G (Eric Lipton, *Feud in Kazakh President's Family Spills Into*

*U.S.*, N.Y. Times, May 29, 2011); Ex. H (Liz Hoffman, *Kazakhstan Beats $1.2B Claims Over*

*Axed Oil Contract*, Law360, June 15, 2012); Ex. I (*Caratube Oil Company and its Majority*

*Shareholder Devincci Hourani Launch ICSID Arbitration Seeking over USD 1 Billion*

*Compensation for Expropriation from Kazakhstan*, PRNewswire, June 17, 2013).

       The Complaint alleges that PsyberSolutions, Ms. Blair, and Mr. McCarthy

established three websites, two Facebook pages, a YouTube channel, and three Twitter accounts

on which they published words and images defaming Plaintiff and "assassinating" his character

by connecting him to Ms. Novikova's murder.  Compl. ¶¶ 10-18, 22-45.  The Complaint also

alleges that Messrs. Thomson and McCarthy, at the instruction and direction of the other

---

[4] In 2007, Mr. Aliyev was arrested in Austria in connection with the kidnapping and murder of
two managers of Nurbank, a Kazakhstani private bank that Mr. Aliyev controlled at the time of
those murders.  Arbitration Decision ¶ 73; Ex. J (RadioFreeEurope RadioLiberty, "*Kazakhstan:*
*Criminal Scandal Widens Around Ex-Ambassador Aliev*," Aug. 28, 2007).  On February 24,
2015, Mr. Aliyev allegedly committed suicide, while awaiting trial on these charges in an
Austrian jail.  Ex. K (Rick Lyman, *Ex-Member of Kazakhstan's Inner Circle Dies in Vienna Jail*,
N.Y. Times, Feb. 24, 2015); Opp'n, Ex. A (Decision of Investigation Judge Abdullah) at 5, 8.

Defendants, organized a vigil outside the London home of Plaintiff's brother on June 19, 2014, and a demonstration in Hyde Park and outside the Lebanese Embassy in London on November 16, 2014 (collectively, the Demonstrations) to commemorate the tenth anniversary of Ms. Novikova's death.  Compl. ¶¶ 19-21, 46-51.  Plaintiff alleges that Mr. Thomson hired an events and marketing company to organize a group of actors to conduct the vigil by informing the company that Plaintiff and his brother had admitted committing the crimes and that the occupants of the residence would be sympathetic.  *Id.* ¶¶ 48-49.  Further, the Complaint alleges that paid actors conducted the Demonstrations and used banners and placards bearing Plaintiff's photograph and the word "Murderer."  *Id.* ¶¶ 51, 54.  The Internet Protocol (IP) address used for establishing the websites that displayed videos of the Demonstrations is allegedly owned by PsyberSolutions and Ms. Blair.  *Id.* ¶¶ 34-35.

In opposing the motion to dismiss, Plaintiff asserts that Defendants created the websites, posted on YouTube and Facebook, and conducted the Demonstrations for money:

> [D]efendants are not reporting on a news story.  They are also not individuals expressing their own protected views as to plaintiff. Defendants are people who were hired to stage fake protests in London depicting plaintiff and his brother on large placards with the word "murderer" written above their picture.  Defendants filmed these fake demonstrations, and then created websites and also made postings on YouTube and Facebook showing the demonstrations they filmed and other staged material alleging that plaintiff and his brother were involved with the murder of a young woman in Beirut. Defendants did all this for money.
>
> Nothing in the complaint alleges that defendants knew anything about the plaintiff or his brother before they were hired.

Opp'n at 6.

The Complaint alleges six counts: (1) Conspiracy to Defame; (2) Defamation; (3) Defamation, Actual Malice; (4) Defamation, Reckless Disregard/Malice; (5) False Light; and (6) Emotional Distress.  Plaintiff claims over $100 million in damages.

Defendants move to dismiss on two grounds:  (1) lack of personal jurisdiction over Messrs. Thomson and McCarthy, who reside in New York and Pennsylvania, respectively, and have no minimum contacts with the District of Columbia; and (2) failure to state a claim against PsyberSolutions and Ms. Blair because Plaintiff is a limited-purpose public figure who must plead facts to show malice and he has not done so.  Plaintiff opposes.

## II. LEGAL STANDARDS

### A.  Motion to Dismiss for Lack of Personal Jurisdiction

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing a factual basis for the court's exercise of personal jurisdiction over the defendant.  *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990).  The plaintiff must allege specific acts connecting the defendant with the forum.  *Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001); *see First Chi. Int'l v. United Exchange Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988) ("[T]he general rule is that a plaintiff must make a prima facie showing of the pertinent jurisdictional facts.").  Bare allegations and conclusory statements are insufficient.  *Second Amendment*, 274 F.3d at 524.  Further, a plaintiff cannot aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any single defendant.  *See Rush v. Savchuk,* 444 U.S. 320, 331-32 (1980).

In determining whether a factual basis for personal jurisdiction exists, the court should resolve factual discrepancies appearing in the record in favor of the plaintiff.  *Crane*, 894 F.2d at 456.  However, the court need not treat all of the plaintiff's allegations as true.  *Plesha v. Ferguson*, 760 F. Supp. 2d 90, 92 (D.D.C. 2011).  Instead, the court "may receive and weigh

affidavits and any other relevant matter to assist it in determining the jurisdictional facts." *Id.* (internal quotation marks and citation omitted).

### B. Motion to Dismiss for Failure to State a Claim

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face. Fed. R. Civ. P. 12(b)(6). A complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true "even if doubtful," *id.*, to state a claim for relief that is "plausible on its face." *Id.* at 570. Even so, a court need not accept as true legal conclusions set forth in a complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In deciding a Rule 12(b)(6) motion, a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007). A court may take judicial notice of public records, *id.* at 1059, including facts on the record of other proceedings, *see Covad Commc'ns Co. v. Bell Atlantic Co.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005). A court also may take judicial notice of historical, political, or statistical facts, or any other facts that are verifiable with certainty. *Mintz v. FDIC*, 729 F. Supp. 2d 276, 278 n.5 (D.D.C. 2010). Thus, the Court takes judicial notice of the public record of *Hourani v. Mirtchev*, the Arbitration Decision, and the Decision of the Investigation

Judge cited above.  Also, the Court takes judicial notice of the fact that the news articles cited above concerned Plaintiff.

### III. ANALYSIS

#### A. Lack of Personal Jurisdiction over Thomson and McCarthy

#### 1. General Jurisdiction

The Court cannot exercise general personal jurisdiction over Messrs. Thomson and McCarthy.  Under the D.C. Code provision regarding general jurisdiction, "[a] District of Columbia court may exercise personal jurisdiction over a person domiciled in, organized under the laws of, or maintaining his or its principal place of business in, the District of Columbia as to any claim for relief."  D.C. Code § 13-422.  In addition, case law has established that "continuous and systematic" contacts with a forum can give rise to general jurisdiction, thereby permitting jurisdiction over a defendant in a suit not arising out of the defendant's contacts with the forum.  *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414-15 & n. 9 (1984); *see also Bond v. ATSI/Jacksonville Job Corp Ctr.,* 811 F. Supp. 2d 417, 422 (D.D.C. 2011) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)) (a court may exercise general personal jurisdiction in this district where the defendant is domiciled in or has his principal place of business in the District of Columbia or where defendant's conduct and connection with the forum are such that he should reasonably anticipate being sued here).

Mr. Thomson resides in New York and Mr. McCarthy resides in Pennsylvania. The Court does not have general personal jurisdiction over either man because they do not live or work in the District of Columbia and there are no allegations that they have systematic contacts with the District such that they should reasonably anticipate being sued here.

### 2. Long-Arm Jurisdiction

In addition, the Court cannot exercise long arm-jurisdiction over Messrs. Thomson and McCarthy.  To establish long-arm jurisdiction over a non-resident, a court must engage in a two-part inquiry:  "A court must first examine whether personal jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process."  *GTE New Media Servs. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000).  In a diversity case such as this one, the federal district court's jurisdiction is coextensive with that of a District of Columbia court.  *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004).  A forum may assert specific jurisdiction over an out-of-state defendant who has not consented to suit there so long as "the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985) (internal citation and quotation marks omitted).

Due process limits a court's power to assert jurisdiction over a nonresident defendant.  The due process clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution require that personal jurisdiction be exercised over a defendant only if he has "purposely established minimum contacts with the forum State," *Burger King*, 471 U.S. at 476, "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted).  These minimum contacts must be grounded in "some act by which the defendant purposefully avails itself of the privilege of conducting activities with the forum State, thus invoking the benefits and protections of its laws."  *Burger King*, 471 U.S. at 476.  In short, "the defendant's conduct and connection with the forum State [must be] such that he

should reasonably anticipate being haled into court there." *GTE New Media*, 199 F.3d at 1347

(quoting *World-Wide Volkswagen*, 444 U.S. at 297).  This standard ensures that a defendant will

not be sued in a jurisdiction solely as a result of random, fortuitous, or attenuated contact with

the forum.  *Burger King*, 471 U.S. at 475.

Defendants Thomson and McCarthy are not subject to personal jurisdiction under

the D.C. long-arm statute.  That statute provides, in relevant part:

> (a) A District of Columbia court may exercise personal jurisdiction
> over any person, who acts directly or by an agent, as to a claim for
> relief arising from the person's—
>
> . . .
>
> (3) causing tortious injury in the District of Columbia by an act or
> omission in the District of Columbia; [or]
>
> (4) causing tortious injury in the District of Columbia if he [i]
> regularly does or solicits business, [ii] engages in any other
> persistent course of conduct or [iii] derives substantial revenue from
> goods used or consumer, or services rendered, in the District of
> Columbia.

D.C. Code § 13-423(a)(3) & (4).[5]  Subsection 3 requires tortious injury in the District of

Columbia by an act of someone in the District of Columbia and subsection (4) requires tortious

injury in the District by someone who engages in a persistent course of conduct or derives

substantial revenue from the District of Columbia.  Publishing defamatory statements within the

District that were made outside the District does not meet the terms of § 13-423(a)(3) or (4).  *See*

*Forras v. Rauf*, No. 14-7070, slip op. at *10-11 (D.C. Cir. Feb. 12, 2016) (citing *McFarlane v.*

*Esquire Magazine*, 74 F.3d 1296 (D.C. Cir. 1996)).  Subsection (a)(3) did not permit personal

---

[5] Subsection (b) of § 13-423 qualifies the reach of the statute by noting that "[w]hen jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him."  D.C. Code § 13-423(b).

jurisdiction in the District of Columbia over the author of an article written in New York. *Id*. at 1300. Further, "*writing* an article for a publication that is circulated throughout the nation, including the District, hardly constitutes doing or soliciting business, or engaging in a persistent conduct, *within* the District" and thus does not satisfy the requirements of (a)(4). *Id*. at 1300 (emphasis in original). There is no allegation that Messrs. Thomson or McCarthy wrote or made any defamatory statements in the District of Columbia. Further, the alleged injury—to Plaintiff's reputation—occurred in Virginia where Plaintiff lives. Plaintiff does not allege that he suffered any injury in the District of Columbia. Because the alleged tortious conduct occurred elsewhere and the alleged tortious injury occurred in Virginia, there is no personal jurisdiction here over Messrs. Thomson and McCarthy under the D.C. long-arm statute.

Plaintiff argues that Ms. Blair and PsyberSolutions' actions in, and connections to, the District of Columbia should enable the Court to exercise personal jurisdiction over their agents, Messrs. Thomson and McCarthy, emphasizing the long-arm statute's reference to an "agent." Plaintiff misunderstands the statute's reference. The D.C. long-arm statute permits a court to exercise personal jurisdiction over a principal who is outside the District of Columbia and s/he directs the conduct of an agent inside the District. *See* D.C. Code § 13-423(a)(3) & (4) (a D.C. court can exercise jurisdiction over "any person, who acts directly or by an agent . . . causing tortious injury in the District"); *see also Smith v. Jenkins*, 452 A.2d 333, 335-36 (D.C. 1982) (a nonresident defendant purposefully avails itself of the privilege of conducting activities within the forum when it directs an agent who acts within the forum). This is consistent with agency law, which provides that a principal can be liable for the actions of the agent. *See, e.g.*, *Associated Producers, Ltd. v. Vanderbilt Univ.*, 76 F. Supp. 3d 154, 166-67 (D.D.C. 2014). The long-arm statute does not provide for the reverse, that is, it does not permit personal jurisdiction

over an agent who is outside the District of Columbia just because his actions are controlled by a

principal located inside the District of Columbia.

        Plaintiff also argues that because the IP address used to establish the allegedly

defamatory websites at issue was owned by D.C. residents Ms. Blair and PsyberSolutions and

the server supporting the offending websites was in the District, these contacts should give rise to

personal jurisdiction over Messrs. Thomson and McCarthy.  Plaintiff relies on *Kline v. Williams*,

Civ. No. 05-1102(HHK), 2006 WL 758459, at *3-4 (D.D.C. Mar. 23, 2006) for this

proposition.[6]  In *Kline*, the plaintiff alleged that she was defamed and her copyright was

infringed when certain material was posted on a website.  *Id*. at 1.  Even though the information

on the website could be viewed by Internet users everywhere, this fact did not create nationwide

personal jurisdiction.  The critical fact for the determination of personal jurisdiction was where

the tortious injury occurred, and the *Kline* court pointed out that the plaintiff was injured in the

place where she lived and worked, not in the District of Columbia.

> Although the allegedly defamatory posts and infringed self-portraits
> were accessible to Internet users within the District, there is nothing
> in her pleadings that indicates she "suffered any injury in the District
> of Columbia that [she] could not have suffered in any state in the
> nation where someone may have read the message and reacted
> negatively towards [her]." *Mallinckrodt Medical, Inc. v. Sonus
> Pharm., Inc.,* 989 F. Supp. 265, 273 (D.D.C. 1998). In *Mallinckrodt,*
> the plaintiff claimed that a derogatory posting on an AOL bulletin
> board caused injury in the District because this posting was
> accessible to 200,000 AOL subscribers in the District. *Id.* at 272.
> However, because plaintiff neither worked nor lived in the District,
> the injury felt in the forum was indistinguishable from that felt
> anywhere AOL subscribers resided. *Id.* at 273. Exercising personal

---

[6] It is undisputed that the Court may exercise general personal jurisdiction over Ms. Blair and
PsyberSolutions because they are both residents of the District of Columbia.  *See* D.C. Code
§ 13-422 ("A District of Columbia court may exercise personal jurisdiction over a person
domiciled in, organized under the laws of, or maintaining his or its principal place of business"
in the District).  Ms. Blair lives in the District, and PsyberSolutions is a limited liability
corporation with its principal place of business here.

jurisdiction in such cases would in essence create a "nationwide jurisdiction for defamation action" explicitly banned by prior caselaw. *Id.*

*Kline*, 2006 WL 758459, at *3.  Further, Plaintiff's allegations that D.C. residents Ms. Blair and PsyberSolutions owned the IP address used to establish the websites and that website's server is in the District of Columbia do not establish Thomson or McCarthy's contacts with, or conduct in, the District.

Because Plaintiff has advanced no factual or legal basis for this Court to assert personal jurisdiction over Mr. Thomson or Mr. McCarthy, they will be dismissed as parties to this case.[7]

### B. Failure to State a Claim Against Blair and PsyberSolutions

All of the claims against Ms. Blair and PsyberSolutions will be dismissed. Plaintiff is a limited-purpose public figure who failed to plead facts to support a claim of malice. Further, Virginia does not recognize the tort of false light.  Finally, Plaintiff has failed to state a claim for intentional infliction of emotional distress.

### 1. Applicable Law

Federal courts sitting in diversity must apply the conflicts of law rules of the jurisdiction in which they sit.  *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 491 (1941).

---

[7] Plaintiff did not respond to Defendants' argument that the Complaint fails to establish personal jurisdiction under a conspiracy theory of jurisdiction pursuant to D.C. Code § 13-423(a).  *See* Mot. to Dismiss at 11-12 (citing *United States v. Philip Morris*, 116 F. Supp. 2d 116 (D.D.C. 2000)).  In this Circuit, an argument to which there is no response is conceded.  *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."), *aff'd sub nom. Hopkins v. Women's Div., Gen. Bd. of Global Ministries, United Methodist Church*, 98 F. App'x 8 (D.C. Cir. 2004).  Accordingly, Plaintiff has conceded this point.

Thus, to determine what law to apply, this Court must apply the District of Columbia's choice of law analysis.  *YWCA v. Allstate Ins. Co.*, 275 F.3d 1145, 1150 (D.C. Cir. 2002).

In deciding which jurisdiction's substantive law governs a dispute, District of Columbia courts blend a "governmental interests analysis" with a "most significant relationship" test.  *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 842 (D.C. Cir. 2009) (citing *Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 40–41 & n.18 (D.C. 1989)); *see also Jaffe v. Pallotta TeamWorks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004).  Under the "governmental interests analysis," courts evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the case.  *Oveissi*, 573 F.3d at 842 (citing *Hercules*, 566 A.2d at 41).  Under the "most significant relationship" test, courts consider the following factors: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered.  *Oveissi*, 573 F.3d at 842 (citing *Restatement (Second) of Conflict of Laws* § 145(2) (1971)); *see also Herbert v. Dist. of Columbia*, 808 A.2d 776, 779 (D.C. 2002).

"Generally, for tort claims the jurisdiction in which the injury occurred has the most significant relationship."  *Mattiaccio v. DHA Group, Inc.*, 20 F. Supp. 3d 220, 228 (D.D.C. 2014) (citing Restatement (Second) Conflicts of Laws § 156 cmt. b (1971)).  Further, "[t]he ultimate goal of a governmental interest analysis is to determine the jurisdiction with 'the most significant relationship' to the issue in dispute."  *Id*.  In defamation suits, "[t]he weight of authority considers that the law to be applied is . . . [that of] the place where the plaintiff suffered injury by reason of his loss of reputation."  *Weyrich v. New Republic Inc.*, 235 F.3d 617, 626

(D.C. Cir. 2001) (citing Restatement (Second) Conflicts of Laws § 150 cmt. e (1971)).

Similarly, the D.C. Circuit applies the law of a plaintiff's domicile in suits alleging intentional

infliction of emotional distress. *Oveissi*, 573 F.3d at 842-43 (French law applied to plaintiff's

claim of intentional infliction of emotional distress because plaintiff was a resident of France at

the relevant time).

      Here, Plaintiff is a Virginia resident.  He has not alleged that he has any

connection to the District of Columbia.  Any injury he may have suffered due to the alleged torts

occurred in Virginia, where he lives.  Accordingly, Virginia law applies.

## 2. Defamation

      Although the Virginia common law of defamation governs here, the First

Amendment's free speech clause restricts the common law where the plaintiff is a public figure.

*See Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1091-92 (4th Cir. 1993).  Under Virginia law,

written defamation is referred to as "libel" while spoken defamation is "slander." *Jordan v.*

*Kollman*, 612 S.E.2d 203, 207 (Va. 2005).  A plaintiff claiming defamation must allege

publication of a false and defamatory statement with the requisite intent. *Taylor v. CNA Corp.*,

782 F. Supp. 2d 182, 201 (E.D. Va. 2010); *Gazette, Inc. v. Harris*, 325 S.E.2d 713, 724-25 (Va.

1985).  The requisite intent standard varies based on whether the plaintiff is a public or private

figure. *Id*.  While states define the standard of liability for a publisher of defamatory falsehoods

that inure a private individual, a plaintiff who is a public figure or a "limited-purpose public

figure" must allege actual malice to state a claim for defamation. *See Wynn v. Wachovia Bank,*

*N.A.*, Civ. No. 3:09-136, 2009 WL 1255464, at *4 (E.D. Va. May 6, 2009).  To recover on such a

claim he must prove actual malice by clear and convincing evidence. *See Jordan*, 612 S.E.2d at

207.  This requirement arises from Supreme Court precedent regarding the First Amendment:

> As an accommodation to the First Amendment's protection of free speech and press, the Supreme Court has held that "public officials" and "public figures" must prove, as part of a defamation case, that the allegedly defamatory statement was made with "actual malice," meaning that it was made "with knowledge that it was false or with reckless disregard to whether it was false or not."

*Hatfill v. N.Y. Times Co.*, 532 F.3d 312, 317 (4th Cir. 2008) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964) (as to a public official) & *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 162 (1967) (as to a public figure)).  To allege actual malice, a plaintiff must assert that the defendant "realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement."  *Jordan*, 612 S.E.2d at 207.  It is not enough to prove simply that the defendant failed to investigate or check the accuracy of a false statement, he must have had a "subjective awareness of the probable falsity" of the publication.  *Hatfill*, 532 F.3d at 317 (quoting *Gertz*, 418 U.S. at 335 n.6).

Virginia courts, relying on the Supreme Court, recognize three classes of public figures:

> (1) "involuntary public figures," who become public figures through no purposeful action of their own;
>
> (2) "all-purpose public figures," who achieve such pervasive fame or notoriety that they become public figures for all purposes and in all contexts; and
>
> (3) "limited-purpose public figures," who voluntarily inject themselves into a particular public controversy and thereby become public figures for a limited range of issues.

*Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1551-52 (4th Cir. 1994) (relying on *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)).  *Gertz* held that a person may "inject himself or [be] drawn into a particular public controversy" sufficiently to become a "public figure for a limited range of issues" and that on those issues, such a person can prevail in a defamation suit only by proving the defendant's actual malice.  418 U.S. at 332, 351.  The *Gertz* Court explained that

public figures must allege and prove actual malice because they have a greater opportunity to counteract false statements than so private persons.

> The first remedy of any victim of defamation is self-help—using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation. Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements then private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater.

418 U.S. at 344.

Defendants argue that Devinnci Hourani is a limited-purpose public figure who must allege actual malice.  Whether Plaintiff is a public figure is a question of law for the court. *Carr v. Forbes, Inc*., 259 F.3d 273, 279 (4th Cir. 2001).

To determine whether a plaintiff is a limited-purpose public figure, courts examine the nature and extent of the individual's participation in the particular controversy giving rise to the defamation.  *Gertz*, 418 U.S. at 352.  Virginia courts focus on whether:

> (1) the plaintiff had access to channels of effective communication;
>
> (2) the plaintiff voluntarily assumed a role of special prominence in the public controversy;
>
> (3) the plaintiff sought to influence the resolution or outcome of the controversy;
>
> (4) the controversy existed prior to the publication of the defamatory statement; and
>
> (5) the plaintiff retained public-figure status at the time of the alleged defamation.

*Hatfill*, 532 F.3d at 319.  The "heart" of the five-factor test is contained in the second and third factors, *i.e.*, whether the plaintiff voluntarily assumed a role of special prominence in the public controversy and whether he sought to influence the resolution of the controversy.  *Hatfill*, 532

F.3d at 319.  A plaintiff's "voluntary assumption" of a role in a public controversy may come as a result of his voluntary association with high officials.  "One may hobnob with high officials without becoming a public figure, but one who does so runs the risk that personal tragedies that for less well-connected people would pass unnoticed may place him at the heart of a public controversy."  *Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 33 (D.C. Cir. 1990).

For example, in *Hatfill*, the plaintiff was a bioterrorism expert who provided commentary on the nation's preparedness for attack.  The Fourth Circuit affirmed the district court's finding that the plaintiff was a limited-purpose public figure who was required to prove malice against *The New York Times* in connection with articles that linked him to post-September 11 anthrax attacks.  *Hatfill*, 532 F.2d at 322-24; *see also Clyburn*, 903 F.2d at 33 (boyfriend of woman who collapsed from a drug overdose at a party attended by government officials was a limited purpose public figure due to his contacts with those officials); *Marcone v. Penthouse International Magazine for Men,* 754 F.2d 1072, 1086 (3rd Cir. 1985) (plaintiff's "voluntary connection" with a widely publicized motorcycle gang contributed to his public figure status with regard to the issue of the gang's drug trafficking).

"Almost anyone who finds himself in the middle of a controversy will likely have enough access to the press to rebut any allegedly libelous statements."  *Clyburn*, 903 F.2d at 32 n.2.  Plaintiff is no exception.  In recent years, he retained top law firms to pursue his business and reputational interests.  *See Hourani v. Mirtchev* Docket Sheet (Plaintiff retained Crowell & Moring LLP in connection with a defamation action); Ex. H (Liz Hoffman, *Kazakhstan Beats $1.2B Claims Over Axed Oil Contract*, Law360, June 15, 2012) (noting that Devinnci Hourani retained Allen & Overy LLP in connection with his arbitration action against Kazakhstan).

19

Further, Ms. Novikova's relationship with Mr. Aliyev, a high-level public official, and her death at an apartment owned by Plaintiff and his brother, plainly constitute a "public controversy."  Devinnci Hourani is a limited-purpose public figure who voluntarily assumed a role in this controversy.  In Kazakhstan, Plaintiff controlled an enormous fortune.  He was a well-known businessman whose dealings were reported in the press.  Further, he and his brother had close familial and business relationships with Mr. Aliyev, who was wealthy, powerful, and famous due to his positions with the Kazakhstan government and due to the fact that he was the President's son-in-law for many years.  Plaintiff and his brother let Mr. Aliyev's mistress stay in their Beirut apartment.  Plaintiff does not contest any of these facts.[8]  By maintaining a close relationship with Mr. Aliyev and by allowing Mr. Aliyev's mistress to live at his apartment, Plaintiff assumed the risk that if a tragedy occurred, his name would be associated with the event.

Plaintiff argues that "a party does not become a limited purpose public figure by virtue of defending himself from the slanderous claims by the controversy maker such that he must prove actual malice to state an actionable libel claim."  Opp'n at 13.  The Court agrees with his argument and his citation to *Hutchinson v. Proxmire*, 443 U.S. 111, 134-36 (1979) (concluding that "[c]learly those charged with defamation cannot by their own conduct, create their own defense by making the claimant a public figure").  However, Plaintiff misreads Defendants' contention here.  Defendants do not assert that he is a public figure because he was the object of the alleged defamation—the Demonstrations and the Campaign.  Rather, Defendants rest their defense on the fact that Plaintiff was a famous billionaire who was involved

---

[8] Plaintiff also acknowledges that the government of Kazakhstan has alleged that he is a murderer, although he asserts that the allegation is false.  Opp'n at 7.

in the longstanding public controversy regarding the suspicious death of Mr. Aliyev's mistress because that death occurred at Plaintiff's Beirut apartment.  Plaintiff was a public figure due his wealth, businesses, personal relationships, and apartment ownership long before the alleged defamatory Campaign and Demonstrations began in 2014.  Plaintiff's asserted involvement in Ms. Novikova's death remains a current public controversy, as reflected by the recent Decision of Investigation Judge Abdullah and the Appeal of such Decision.

By closely associating with Mr. Aliyev for many years and allowing Mr. Aliyev to house his mistress in his apartment, Plaintiff voluntarily ran the risk of assuming a prominent role in a public controversy.  He became a limited-purpose public figure long before the Demonstrations took place and before the allegedly defamatory statements was published.  As a limited-purpose public figure claiming defamation, Plaintiff must allege facts to support a claim of actual malice.  He must make more than conclusory allegations.  In *Besen v. Parents and Friends of Ex-Gays*, No. 3:12-CV-204-HEH, 2012 WL 1440183 (E.D. Va. Apr. 25, 2012), the Eastern District of Virginia dismissed a complaint for failure to allege facts demonstrating malice.  The complaint there "reveal[ed] only unadorned accusations of malice and a formulaic recitation of the elements of a cause of action."  *Id*., 2012 WL 1440183, at *6.  Because a plaintiff is required to provide the grounds of his entitlement to relief, "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  "Threadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Here, the Complaint makes only the following conclusory allegations:

73.  Even though Plaintiff is not a public figure, actual malice by
Defendants is established by their intentional, reckless, unfounded
publication on the internet of videos, photographs and statements on

21

various websites and Twitter, with is intended to make Plaintiff appear odious, infamous, or ridiculous.

. . .

76. The questions and innuendos contained in Defendants' Campaign were published by Defendants with reckless disregard as to their truth.

. . .

79. Defendants either knew or recklessly disregarded the fact that Plaintiff has not engaged in any criminal conduct.

80. The questions, innuendos and statements in Defendants' Campaign were published by Defendants with reckless disregard of their truth or falsity or with malice.

Compl. ¶¶ 73, 76, 79, 80.  The Complaint does not allege any facts supporting the claim that

PsyberSolutions or Ms. Blair made statements knowing they were false or with reckless

disregard to their truth.  *See Hatfill*, 532 F.3d at 317 (to allege "malice," a plaintiff must allege

that defendant had a "subjective awareness of the probable falsity" of the publication) (quoting

*Gertz*, 418 U.S. at 335 n.6).  The bald allegations of the Complaint are insufficient to allege

malice.[9]  Because Plaintiff has not alleged malice, Counts II, III, and IV alleging defamation

must be dismissed.  Further, without an underlying claim of defamation, Count I alleging

conspiracy to defame, must also be dismissed.  *See Firestone v. Wiley*, 485 F. Supp. 2d 694, 703

---

[9] In opposing the motion to dismiss, Plaintiff did not propose to file an amended complaint with additional allegations of malice, and thus he rests on the allegations of his Complaint.  In fact, he contends that the Defendants created the websites, posted on YouTube and Facebook, and conducted the Demonstrations because they were paid.  He states that "Defendants did all of this for money" and that the Defendants did not know anything about Plaintiff before they were hired.  Opp'n at 6.  These facts do not show that Defendants had any animosity for Plaintiff and they do not show that Defendants had a subjective awareness of the accuracy of the statements they were paid to make.

(E.D. Va. 2007) (a claim of civil conspiracy under Virginia law requires proof than an underlying tort was committed); *Almy v. Grisham*, 639 S.E.2d 182, 189 (Va. 2007).

### 3. False Light

Count V, which alleges a cause of action for false light, also must be dismissed because Virginia law does not recognize such a claim. *See Aitken v. Commc'ns Workers of Am.*, 496 F. Supp. 2d 653, 655 n.1 (E.D. Va. 2007) (false light is not an actionable tort in Virginia); *Falwell v. Penthouse Int'l, Ltd.*, 521 F. Supp. 1204, 1206 (W.D. Va. 1981) (Virginia Code § 8.01-40 excludes actions for false light); *see also WJLA-TV v. Levin*, 564 S.E.2d 383, 394 n.5 (Va. 2002) (under Virginia law, plaintiff who alleges that defendant make unauthorized use of plaintiff's name in a context that is false and offensive is limited to proving defamation). Accordingly, Count V will be dismissed.

### 4. Intentional Infliction of Emotional Distress

Count VI of the Complaint asserts a claim of intentional infliction of emotional distress. As noted above, under D.C. conflicts of law rules, the law of plaintiff's residence applies to claims alleging intentional infliction of emotional distress. *Oveissi*, 573 F.3d at 842-43. Because Plaintiff lives in Virginia, Virginia law applies.

To state a claim for intentional infliction of emotional distress under Virginia law, a plaintiff must allege that (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable; (3) there was a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress was severe. *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991). "[U]nlike a claim for negligence, a plaintiff bringing a claim for intentional infliction of emotional distress must allege all facts necessary to establish the cause of action to withstand challenge on demurrer." *Harris v. Kreutzer*, 624

23

S.E.2d 24, 33 (Va. 2006).  This tort is disfavored in Virginia, due to "the risks inherent in torts where injury to the mind or emotions is claimed."  *Id.*  Virginia courts find that alleged emotional distress was insufficiently severe when a plaintiff does not claim that he sought medical assistance or lost income due to emotional harm.  For example, in *Russo v. White*, 400 S.E.2d 160, 163 (Va. 1991), the plaintiff alleged that she was nervous, could not sleep, experienced stress and "its physical symptoms," withdrew from activities, and was unable to concentrate at work.  She did assert any objective physical injury caused by the stress, that she sought medical attention, that she was confined at home or in a hospital, or that she lost income due to emotional harm.  As a result, the Virginia Supreme Court affirmed the trial court's conclusion that "the alleged effect on the plaintiff's sensitivities is not the type of extreme emotional distress that is so severe that no reasonable person could be expected to endure it."  *Id.*  Here, Devinnci Hourani alleges that the Defendants' Campaign caused "a disturbance of Plaintiff's mental and emotional tranquility of an acute nature," *see* Compl. ¶ 91; that Plaintiff suffered "special harm" by being branded a murderer, *see id.* ¶ 92; and that Defendants should be liable for "mental and emotional distress," *see id.* ¶ 93.  Such allegations are insufficient to support a claim for intentional infliction of emotional distress under Virginia law.  Count VI will be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss [Dkt. 15] will be granted and this case will be dismissed.  A memorializing Order accompanies this Opinion.


Date: February 18, 2016                                    _____/s/_____
                                                                        ROSEMARY M. COLLYER
                                                                        United States District Judge